**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ZENA ALSANABANI in her individual capacity and/or Executor of The Estate of Abdulmalek Anwar Alsanabani<br><br>                    Plaintiffs,<br><br>    -against-<br><br>SPEAR  OPERATIONS  GROUP, ABRAHAM GOLAN, Reflex Responses Management Consultancy LLC d/b/a Reflex Response Security Consultants and ERIK PRINCE and The Bank of New York Mellon Corp. and the First Abu Dhabi Bank USA N.V and JOHN DOE 1-100, ABC Corporation 1-100.<br><br>                    Defendants. | Case No.<br><br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiffs, by their undersigned counsel, complain to the Defendants, and hereby allege for their

complaint upon information and belief as follows:

**INTRODUCTION**

1.       This is a civil action for wrongful death, personal injury and related torts pursuant to the

Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331-2339D, as well as commission of torture and

extrajudicial killing pursuant to 18 U.S.C. § 2340 (a)(1) and (18 U.S.C. §§ 1350) and the Torture

Victim Protection Act of 1991 ("ATA") against the members of a terrorism financing conspiracy

spearheaded by the government and the United Arab Emirates ("UAE"), whose sponsorship of

acts of terrorism under the guise of counterterrorism killed or  maimed Plaintiffs in a series of

1

heinous. terrorist attacks in The Republic of Yemen ("Yemen").

2.      The UAE is benefitting from the enterprise in financial and political terms. It has for many years recruited foreign mercenaries to deploy in Yemen to liquidate persons it considers misaligned with its economic interests, labeling them as "rebels" and terrorists. Tens of thousands of men, women and children have been killed or maimed in organized and routine ambushes, assassinations, and kidnappings. Critical infrastructure has been degraded by bombings that have destroyed hospitals, schools, and factories.

3.      For many years, the UAE has less than covertly financed and supported mercenaries including The Spear Operations Group.

4.      The Spear Operations Group ("SOG") is a Delaware-based private military company that was hired by the United Arab Emirates to carry out operations in Yemen to support the Emirati intervention in the Yemeni Civil War. It was founded by Abraham Golan, a Hungarian-Israeli security contractor.[1]

5.      SOG was recruited and paid by the UAE to carry out a program of terror in Yemen as part of the Yemeni Civil War which upon on information and belief constitutes a violation of the War Crimes Act of 1996.[2345]

6.      SOG assembled a  team of mercenaries who are veterans of the United States Armed Forces and the French Foreign Legion. The Emirati military supplied these mercenaries with

---

[1] Roston, Aram. "American Mercenaries Were Hired to Assassinate Politicians in The Middle East". BuzzFeed News. BuzzFeed. Retrieved 16 October 2018.
[2] Shickman, Ittai (2018-10-17). "The Israeli assassin who teamed up with Mohammad Dahlan". Ynetnews. Retrieved 2019-02-21.
[3] "Abbas Rival 'Hired American Mercs for Targeted Killings in Yemen on Behalf of UAE'". Haaretz. 2018-10-16. Retrieved 17 October 2018.
[4] Avant, Deborah (October 19, 2018). "Former U.S. Special Forces were reportedly hired to kill Yemen's leaders. Did the government know?". The Washington Post. Retrieved 23 October 2018.
[5] Goodman, Ryan; Knuckey, Sarah (October 18, 2018). "DOJ MU.S.t Investigate Possible War Crimes by American Mercenaries in Yemen: There is no legal "gray area"—Americans cannot assassinate civilians.

training, weapons, explosives and Emirati uniforms, military ranks, and identification.[67] Other security companies and individuals were also engaged to carry out operations up to and including overseeing bombings and other crimes because little if any effort was made to limit collateral damage to civilians. (See also JOHN DOE 1-100, ABC Corporation 1-100).

7.      SOG was responsible for various assassinations and attempted assassinations of opposition political figures, the gathering of intelligence and the supervision and training of Emirati responsible for interrogations, training and acts of torture that constitute war crimes.[89]

8.      SOG claimed credit for a number of high-profile assassinations. Their targets included civilian targets as well as some "out and out terrorists."[10]

9.      After SOG's illegal assassinations became public, U.S. Senators Elizabeth Warren and Bob Menendez demanded that the U.S. State Department investigate SOG's involvement in the war in Yemen. Warren also sent a letter to the Justice Department calling for an investigation into the group.[111213]

10.     The lawlessness of the UAE's actions, including but not limited, to SOG and SOG's trainee's war crimes has evoked condemnation in the U.S. Congress. In addition to substantial financial support for these actions, the UAE has, under the guise of eliminating Islamic terrorists,

---

[6] Keller, Megan (2018-10-22). "Warren wants probe into whether former U.S. soldiers worked as assassins for UAE". The Hill. Retrieved 2019-02-21.
[7] Trevithick, Joseph. "UAE Contracted an American Hit Squad to Kill Political Figures and More in Yemen". The Drive. Retrieved 2019-02-21.
[8] Clark, James (16 October 2018). "Former U.S. special operators were reportedly hired to assassinate Yemeni political figures". Business Insider. Retrieved 4 July 2019.
[9] Uqba, Sana (16 October 2018). "UAE hired Israeli mercenary to lead U.S. death squad on Yemen assassination spree". al-Araby. Retrieved 2019-02-21.
[10] "Abbas's rival 'hired Israeli mercenary to assassinate UAE's enemies in Yemen'". Times of Israel. 17 October 2018. Retrieved 4 July 2019.
[11] Supra Footnote 6
[12] "Menendez Demands Answers Following Reports Alleging U.S. Citizens Working as Mercenaries Abroad". U.S. Senator Bob Menendez of New Jersey. Newark, New Jersey. February 8, 2019. Retrieved 5 July 2019.
[13] Villa, Lissandra (October 22, 2018). "Elizabeth Warren Demands an Investigation into American Ex-Soldiers' Assassination Campaign in Yemen". BuzzFeed News. Retrieved 5 July 2019.

eliminated opponents to the UAE's meddling in Yemeni affairs and caused widespread collateral damage to innocent civilians and to private property.

11.     As a result of SOG's actions sponsored by the UAE countless innocent civilians have been wounded or killed while SOG and SOG trained Emirati regulars and irregulars targeted opposition leaders for death through bombings, drones, and improvised explosive device (IED) and other strikes.

12.     As a result of SOG's actions sponsored by the UAE, countless innocent civilians have been kidnapped, illegally detained, tortured and wounded while SOG and SOG trained Emirati regulars and irregulars oversaw or participated in such lawless and illegal activities.

13.     Abraham Golan, upon information and belief is the Hungarian-Israeli former Colonel in the French Foreign Legion and naturalized American citizen who leads SOG.[14]

14.     SOG's paymaster, the UAE, has been described as an "unreliable partner that has fueled conflict, transferred U.S.-supplied weapons to extremist groups, and inflicted severe human rights abuses on its own population."[15]

15.     "Despite claims to the contrary, the UAE continues to play a role in the brutal war in Yemen, which has resulted in nearly a quarter of a million deaths and pushed millions to the brink of famine, even as it has created more space for extremist groups like Al Qaeda in the Arabian Peninsula (AQAP) to operate and recruit new members and driven the Houthi rebels closer to Iran. The UAE has transferred U.S. supplied weapons, including armored vehicles, to extremist militias in Yemen, some of which have ties to AQAP."[16]

16.     The UAE "have used U.S.-manufactured weapons as a form of currency to buy the

[14] https://twitter.com/lostweapons/statU.S./1052571103795634177?lang=en
[15] https://www.forbes.com/sites/williamhartung/2021/04/23/selling-arms-to-the-uae-is-not-in-U.S.-security-interests/?sh=572d8a7e50db
[16] Ibid

loyalties of militias or tribes, bolster chosen armed actors, and influence the complex political landscape, according to local commanders on the ground."[17]

17.    "Abu Abbas, the founder, was declared a terrorist by the U.S. in 2017, but the group still enjoys support from the … coalition… absorbed into the 35th Brigade of the Yemeni army."[18]

18.    "Nearly half a dozen Mine-Resistant Ambush Protected (MRAP) vehicles sit side by side, most bearing stickers with the insignia of the Giants Brigade. One even has the export label on it showing it was sent from Beaumont, Texas to Abu Dhabi, in the UAE, before ending up in the hands of the militia."

19.    "Recipients of U.S. weaponry are legally obligated to adhere to end-use requirements which prohibit the transferring of any equipment to third parties without prior authorization from the U.S. government. That authorization was never obtained."[19]

20.    "The Giants Brigade is a "part of Yemeni forces," the official told CNN, adding that the group was under the direct supervision of the UAE and, therefore, the equipment was in the "collective possession" of the coalition. The U.S. Department of Defense, when asked specifically about the Giants Brigades, said it had not given …the UAE permission to hand over U.S. weaponry to other factions on the ground."[20]

21.    SOG, acting at the direction of its clients inside the UAE, oversaw training of Yemeni and Emirati personnel on American-made firearms, up-armored vehicles, and explosive ordinance and other material, often to kill Yemeni deemed undesirable by officials of the UAE government, even people without any established ties to the Houthi rebels.

22.    It is alleged that Reflex Response Security Consultants ("RRSC") also trained Yemeni

---

[17] https://www.cnn.com/interactive/2019/02/middleeast/yemen-lost-U.S.-arms/
[18] Ibid
[19] Ibid
[20] Ibid

personnel while providing large numbers of well-trained Columbian personnel who are veterans of Columbia's narco-terrorism wars.[21] RRSC has been described as a private military company created to bolster the Emirati military by providing specialized mercenary support. Funded by the Crown Prince of Abu Dhabi, the organization initially employed Colombian military veterans trained by experienced personnel from the US, UK, France, and South Africa. RRSC was overseen by Erik Prince, a well-known figure in the private security sector, who previously founded Blackwater, the notorious military contractor that became a household name during the Iraq and Afghanistan conflicts.[22]

23.    The UAE, not content to work exclusively with mercenaries like SOG and RRSC to train and organize combat units attached to the UAE, subsequently created a political structure named the Southern Transitional Council ("STC"). Working through the STC the UAE allegedly funded RRSC to the tune of $528 million (USD) to create its' private mercenary army.[23]

24.    On March 5, 2024, Amnesty International condemned the STC claiming that "their de facto authorities' unlawful and arbitrary measures are fostering a climate of intimidation and fear and restricting the rights to freedom of expression, association and participation in public affairs"[24]

25.    Pursuant to their unlawful conspiracy, the Defendants and their co-conspirators provided material support and resources to the UAE, SOG, the PIJ and the STC and the RRSC that allowed these notorious terrorist organizations to carry out each of the brutal terrorist attacks against the Plaintiffs and/or their family members described below, which left Plaintiffs severely physically

---

[21] https://www.ebsco.com/research-starters/military-history-and-science/reflex-responses
[22] Ibid
[23] FYI: The Reflex Response to Protesters in the UAE – Raj Patel "Muslim soldiers, Mr. Prince warned, could not be counted on to kill fellow Muslims"
[24] https://www.amnesty.org/en/latest/news/2024/03/yemen-southern-transitional-council-must-end-crackdown-on-civic-space/

and/or psychologically injured. Accordingly, the Defendants are liable pursuant to 18 U.S.C. § 2333 and other claims to the Plaintiffs, who were injured by reason of an act of international terrorism.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a) and 2338 as a civil action brought by citizens of the United States who have been injured by reason of acts of international terrorism and their estates, survivors, and heirs.

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d). and Defendant Golan is a resident and citizen of the District of Columbia.

28.     Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), and Fed. R. Civ. P. 4(k)(1)-(2) because they have transacted business and committed tortious acts within the United States by transferring funds through the United States for the benefit of SOG and associates thereof and have purposefully availed themselves of United States jurisdiction in the course of committing the wrongful acts alleged herein. Specifically, in furtherance of their conspiracy with Defendants, the UAE purposefully and knowingly effectuated U.S. dollar-denominated funds transfers on behalf of the UAE through banks in the U.S. including upon information and belief First Abu Dhabi Bank U.S.A N.V. in DC, and the Bank of New York and knew or should have known these transfers were made for the ultimate benefit of SOG and other extralegal mercenary companies functioning as designated terrorist organizations.

## THE PARTIES

### The Plaintiffs

29.    Plaintiff ZENA ALSANABANI at all times relevant hereto is and was a U.S. citizen domiciled in Towson, Maryland and the sister, heir, and personal representative of the estate of decedent Abdulmalek Al-Sanabani who was murdered by the UAE and SOG trained operatives on September 11th, 2021. At all times relevant hereto decedent Abdulmalek Al-Sanabani was a resident of the State of California and was targeted by these terrorists because he was identified as a U.S. National. Plaintiff ZENA ALSANABANI brings this action individually and on behalf of the Estate of decedent Abdulmalek Al-Sanabani.

### The Defendants

30.    Defendant Spear Operations Group ("Spear") is a Delaware limited liability company. Upon information and belief, Spear's member is Abraham Golan, a resident and citizen of the District of Columbia.

31.    Defendant Abraham Golan is the CEO of Spear residing at 3220 Grace Street NW, Unit P2, Washington, DC 20007.

32.    Defendant Reflex Response Security Consultants maintains its offices at Das Tower, Suite 601, Corniche Road, Abu Dhabi, United Arab Emirates

33.    Defendant Erik Prince is an American national, the CEO of RRSC and resides in Abu Dhabi, United Arab Emirates.

34.    Defendant The Bank of New York Mellon Corp. is a Delaware incorporated Bank headquartered at 240 Greenwich Street, New York, NY 10286.

35.     Defendant The First Abu Dhabi Bank U.S.A NV is a Curacao [f/k/a Netherlands Antilles] Bank with its United States headquarters located at 1430 K street N.W., Ste 400 Washington, DC 20005.

36.     JOHN DOE 1-100, (fictional natural persons)

37.     ABC Corporation 1-100. (fictional business entities)


## THE DEFENDANTS' UNINDICTED CO-CONSPIRATORS
### The United Arab Emirates

38.     The United Arab Emirates ("UAE") or the Emirates, is a country in Western Asia located at the eastern end of the Arabian Peninsula. It borders Oman and Saudi Arabia and has maritime borders in the Persian Gulf with Qatar and Iran.

39.     The UAE is an elective monarchy formed from a federation of seven emirates, consisting of Abu Dhabi (where the federal capital, Abu Dhabi, is located), Ajman, Dubai, Fujairah, Ras Al Khaimah, Sharjah, and Umm Al Quwain.

40.     Each emirate is governed by a Sheikh and, together, they form the Federal Supreme Council; one of them serves as President of the United Arab Emirates. In 2013, the UAE's population was 9.2 million, of which 1.4 million were Emirati citizens and 7.8 million were expatriates; the estimated population in 2020 was 9.89 million.

41.     The UAE's oil and natural gas reserves are the sixth- and seventh largest in the world, respectively, and the UAE's economy is the most diversified of all the members of the Gulf Cooperation Council with its most populous. city, Dubai, serving as a global city and international hub.

42.     The UAE is recognized as a regional and a middle power and is a member of the United

9

Nations, the Arab League, the Organization of Islamic Cooperation, OPEC, the Non- Aligned Movement, and the Gulf Cooperation Council.

43.     The UAE has been described as an authoritarian state and according to human rights organizations, there are systematic human rights violations, including the torture and forced disappearance of government critics.

44.     The UAE's more assertive foreign/national security policy in the region has been its involvement in the Yemen war. In Yemen, Abu Dhabi was for a number of years the main backer of southern secessionist and Salafist forces in the south of the country.

45.     In September 2014, the rebel Houthis began to make their way from their northern heartlands south towards Sanaa and Islah-linked military and police units and militias chose to stand down effectively handing the rebels control of the capital.

46.     In March 2015 Saudi Arabia formed a 10-country military coalition and attacked Houthi–Saleh military positions. The UAE ultimately became Riyadh's principal coalition partner on the ground even if the two rarely worked in lockstep.

47.     Abu Dhabi's support for local forces produced the majority of battlefield successes against the Houthis in Yemen, and its allies in the south went on to form a powerful new political bloc. In the north, tribal–Islamist forces backed by Riyadh have been less successful.

48.     Although the Hadi government claimed to be in control of the "Southern Resistance," the task of defending the south was undertaken by a mix of local southern secessionist and Salafist fighters. Operations to oust the Houthis from Aden and the wider south were largely conceived of, planned, and executed by the elite U.S.-trained Special Forces unit of the UAE Presidential Guard. Later, the UAE would help train, equip, and deploy forces to help retake other southern governorates.

49.    By 2016 the UAE appeared to have effectively decided that its main focus would be counterterrorism initiatives and a quiet campaign against Islah, only returning to the forefront of the wider war in early 2018.

50.    The UAE focused on building up local forces that it sponsored on the ground. Its primary allies were southern secessionist groups who came into mounting conflict with the Hadi government, as well as quietist Salafist forces.

51.    The UAE has control over several non-state armed groups, thought to total around 90,000 fighters across the liberated territories, which it supports by providing direct training, capacity building, logistics assistance, and salaries.

52.    In the east, it has the Shabwani and Hadrami Elite Forces, and to the west it has the Joint Forces, including the Guards of the Republic, which brand themselves as the National Resistance, and it has the SBF in the south and the Abu al-Abbas Fighters in the southwest.

53.    The UN's Yemen Panel of Experts' 2020 report concluded that the UAE has had operational control of most of these groups since their establishment although the Yemeni government has claimed otherwise.

54.    The United Arab Emirates ("UAE") has increasingly sought to increase its influence in the region. It has vested interests in the Middle East, North Africa and the Horn of Africa, and has not shied away from using mercenaries in its regional endeavors.[25]

55.    With a small population of around 2.7 million, the UAE has not been able to get enough recruits from within its citizenry to take part in external wars in the region. As a result, it was forced to recruit mercenaries to do "dirty" work on its behalf.[26]

---

[25] https://www.middleeastmonitor.com/20200919-rights-groups-uae-hired-450-mercenaries-to-carry-out-assassinations-in-Yemen.
[26] Ibid

11

56.    Former Palestinian senior security official Mohammed Dahlan has been working with the UAE's crown prince as a security consultant because of his close ties with private security companies which provide mercenaries.[27]

57.    In 2011, the UAE signed a $529 million contract with Reflex Response Security Consultants managed by infamous Blackwater Worldwide founder Erik Prince, who has legal problems in the U.S. because of his security business.[28]

58.    The UAE has relied on mercenaries in its wars in Libya and Yemen and also deployed them in a number of ports in countries along the Red Sea coast.[29]

59.    Around 450 mercenaries from Latin American countries dressed in UAE military uniforms were deployed in Yemen in 2015 to fight alongside the Saudi-led coalition against Houthi rebels, according to a New York Times report. Fighters were trained in UAE deserts by mercenaries before being deployed.[30]

60.    BuzzFeed News reported in 2018 that the UAE hired U.S. mercenaries to kill politicians belonging to the al-Islah party that the UAE considers a "terrorist group" for its alleged affiliation to the Muslim Brotherhood.[31]

61.    The American news media reports the UAE sought to eliminate individuals that have challenged its separatist policies in Yemen; its control over resources of southern Yemen and its military and mercenaries' presence in the strategic Socotra Island.[32]

62.    The International Institute for Rights and Development, and the Rights Radar Foundation, in September of 2020 alleged the UAE hired 450 mercenaries to carry out assassinations in

---

[27] Ibid
[28] Ibid
[29] Ibid
[30] Ibid
[31] Ibid
[32] Ibid

Yemen. These remarks came from a statement read during the 45th session of the United Nations (UN) Human Rights Council held in Geneva.[33]

63.    In sum, the IIRD and RRF lamented, "the escalation of assassination cases in Yemen by the mercenaries," adding *The UAE hired American mercenaries to carry out high-profile assassinations in Yemen. They conducted several operations in Aden and several cities, resulting in the assassinations of dozens of politicians and public figures during the past five years of conflict in Yemen.* According to the statement: "Among 30,000 mercenaries from four Latin American countries hired by the UAE, at least 450 mercenaries have been deployed to Yemen after they received training by U.S. trainers."[34]

64.    "They take advantage of the UN's disregard for their human rights abuses in Yemen to continue their crimes with no accountability." In the statement, the rights groups confirmed that, "…over 80 per cent of Yemeni politicians, lawmakers and media professionals have been displaced locally or globally, seeking safety as they become potential targets for assassination."[35]

65.    The rights groups warned that "the right to life in Yemen is in extreme danger," stressing that the situation: "Needs the UN to offer effective action not just kind words. Enough is enough."[36]

66.    The UAE has provided funding to and partnered with mercenaries who directly assassinated civilian Yemeni political figures and trained paramilitary factions who conducted actions like torturing and bombing that are war crimes and terroristic acts.

67.    These actions and the factions themselves fit the definition of a terrorist organization.

68.    Upon information and belief, First Abu Dhabi Bank U.S.A N.V. in DC, and the Bank of

---

[33] https://www.aa.com.tr/en/middle-east/uae-based-black-shield-recruits-mercenaries-in-region/1914366
[34] Ibid
[35] Ibid
[36] Ibid

New York in New York have been used by the UAE or front companies or NGOs to funnel funds as the UAE has directed to pay SOG and other mercenaries and assassins (see also John Doe 1-100 and ABC corp. 1-100).

### The Torture and Murder of Abdulmalek Al-Sanabani

69.    Abdulmalek Al-Sanabani was a 25-year-old resident of Fresno, California who planned to visit with family in Yemen when he was singled out by mercenaries loyal to the Emirati-backed Southern Transitional Council (STC).

70.    Mr. Al-Sanabani was originally from the north of Yemen. Because the airport in Yemen's capital, Sanaa, was closed due to the war, he had to fly into Aden, Yemen's second-largest city and the stronghold of the Emirati-controlled Southern Transitional Council that has power over most of the southern region of the country.

71.    While driving through the STC-controlled Lahj Province, Mr. Al-Sanabani was stopped at a checkpoint operated by the Security Belt Forces, an armed group loyal to the STC and the UAE government.

72.    While frisking him, the soldiers took note of the fact that he was traveling from the United States and was carrying U.S. dollars.

73.    Mr. Al-Sanabani and his family had saved up money to give to his relatives still in Yemen, but these mercenaries treated him with suspicion, and he was taken into custody by them.

74.    Several days later, the STC-affiliated mouthpiece, Al-Ayyam, reported that soldiers in Lahj Province arrested a suspect. It published photos of Mr. Al-Sanabani on the back of a pickup truck surrounded by STC soldiers in civilian clothing. His family in Yemen saw Al-Ayyam's content featuring their relative and quickly began searching for him. His family found him dead in a hospital with obvious signs of torture and bullet marks throughout his back and leg.

14

75.    A headline in the Arab News tells the whole story. Murder of Yemeni-American in Lahj

sparks outrage. The Prime minister of Yemen called for an investigation, but the terroristic murder

and torture of this young man was eventually swept under the rug.



76.    In pertinent part it was reported that:

> "[t] he death of a Yemeni-American man in the war-torn country's province of Lahj
> has prompted outrage from senior politicians and ordinary citizens.  Abdul Malik
> Al-Sanabani, a 30-year-old Yemeni expatriate living in the U.S., was reportedly
> attacked, robbed, and later murdered by soldiers loyal to the separatist Southern
> Transitional Council on Wednesday at a checkpoint in Tour Al-Baha district.
> Yemen's Prime Minister Maeen Abdulmalik Saeed ordered the authorities in Lahj
> to launch an urgent probe into the killing of Al-Sanabani, official news agency
> SABA reported, adding he had spoken [to] Lahj Gov. Ahmed Al-Turki to bring the
> killers to justice.
>
> Attorney General Ahmed Al-Mosai, meanwhile, issued orders to the chief of the
> Specialized Criminal Court in Aden to take action against those responsible….an
> Aden-based media outlet affiliated with the STC, first reported that soldiers at Tour
> Al-Baha arrested a suspected … taking pictures of military sites. An image …
> showed three soldiers in civilian clothes handcuffing … Al-Sanabani…Al-
> Sanabani's death triggered anger from inside and outside Yemen, as people …
> called for the killers to be brought to justice, and for the unification of military units
> under state control, and an end to harassment of travelers at checkpoints….Brig.
> Khaled Al-Nasi, a Yemeni military analyst, called for the revamping and

unification of security units in the liberated provinces, and for prosecutions to be brought against commanders of checkpoints who allowed or encouraged harassment. **"What happened to Abdul Malik Al-Sanabani is a condemned terrorist act and the leaders mU.S.t be held accountable before the soldiers."** Al-Nasi said on Twitter.

## UNDERLYING FACTS
## UAE AND DEFENDANTS' CONSPIRACY TO FUND UAE AND SOG IN CIRCUMVENTION OF FINANCIAL REGULATIONS

77.    UAE routed significant sums to SOG and RRSC and ABC Corp., 1-100 that it nominally collects for security and training purposes to terrorist and other operational uses under the guise of security or counterterrorism actions.  Even the funds utilized for security purposes free up other funds for specific terroristic acts.  UAE and SOG and RRSC used (and still uses) funds purportedly collected for security purposes to, among other things, provide weapons, explosives, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters. Funds used for UAE and SOG and RRSC's security purposes directly support its military operations, as they support UAE and SOG and RRSC's image-making machine, which increases its fundraising and attracts foot soldier recruits.

78.    As noted above, UAE and its proxies are, for all intents and purposes, a Foreign Terrorist Organization dedicated to the destruction of opponents within the State of Yemen.  It also uses violence, principally bombings, assassinations, and threats of violence to pressure Yemen to cede territory to the UAE or factions it favors.

79.    Since its engagement, SOG and RRSC ABC Corp, 1-100 have carried out dozens of terrorist attacks in Yemen which have been characterized as assassinations. These attacks have killed and injured hundreds of Yemeni and even U.S. nationals.

80.    The UAE also controls dozens of Non-Government Organizations and religious. organizations operating in Yemeni theaters of conflict and have given SOG and others free reign

16

over these groups and used SOG and RRSC and others to supervise, direct and train these groups to conduct murderous. attacks.

81.    As with UAE and SOG and RRSC and affiliates thereof route significant sums that it nominally collects for security and training purposes to terrorist and other operational uses. Even the funds utilized for security purposes free up other funds for specific terrorist acts. Such funds purportedly collected for security purposes to, among other things, provide weapons, explosives, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters whose operations are then described as counterintelligence or counterterrorism. Funds used for security purposes directly support its military operations.

82.    From at least 2011 through 2019, the UAE and SOG and RRSC and ABC Corp. knowingly, willfully, and unlawfully combined, conspired, confederated, and agreed with others to commit numerous. acts of international terrorism, as defined by 18 U.S.C. §§ 2331 and 2332, including acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations.

## UAE and SOG and RRSC and ABC 1-100 SHOULD BE FORMALLY DESIGNATED TERRORIST ORGANIZATIONS

83.    The use and recruitment of mercenaries is legally forbidden by the 1989 International Convention against the Recruitment, Use, Financing and Training of Mercenaries. A mercenary is defined as any person who is specially recruited locally or abroad in order to fight in an armed conflict.

84.    According to UNICEF, more than 10,000 children have been killed or injured in war-torn Yemen. The UN says that the fighting has resulted in the worst humanitarian crisis in the world.

85.    The UAE has also recruited, armed, and trained mercenaries from around the world, in

particular from Colombia and other Latin American countries.

### UAE'S DIRECT AND DELIBERATE FUNDING OF SOG, RRSC, ABC Corp 1-100 and JOHN DOE 1-100

86.    Like any enterprise, terrorist organizations, even those cast as counter terrorists, need money to operate.

87.    It has long been the official policy of the government of UAE to provide financial support to destabilize the Houthi rebels and others they oppose in Yemen.

88.    Amnesty International reported in February 2019 that the UAE was supplying a large amount of weaponry, much of it originally supplied by western countries, to a variety of militia, including some accused of war crimes and linked to Al Qaeda.

89.    This includes the armored vehicles reported in the SIPRI ATDB, as well as machine guns, mortars, and small arms, which are not included in the SIPRI database.

90.    The Euro-Mediterranean Human Rights Monitor and SAM for Rights and Liberties decried the role of the UAE in hiring French and American assassins to commit 'targeted killing' of politicians and clerics in Yemen stating that the use of illegal means that are considered crimes under international law to achieve certain political ends including the assassination of civilians is a double-crime, first by involving mercenaries in an armed conflict, and second the deliberate killing of persons protected under international humanitarian law and international human rights law.

91.    It has also been documented that SOG mercenaries operating with the UAE's military planted a bomb near a political party's headquarters once they learned a political leader was believed to be there with a number of political leaders and journalists.

92.    Some other thirty assassinations of political figures and leaders of the Al-Islah Party have been documented in the months that followed up until the end of 2017. Beyond the targeting of civilians being against international law the indiscriminate killing without a care as to collateral

damage to entirely innocent bystanders make these acts particularly heinous.

93.    While the Houthi group lost control over Aden to the UAE a few years ago, frequent assassinations under the UAE's security umbrella continued. SOG and Golan have described their work in Yemen as mercenary in nature, and the task assigned to the company clearly constituted illegal acts and a crime under international law and even local Yemeni laws.

94.    According to Golan, his company received $1.5 million a month to explicitly "disrupt and destruct" the al-Islah Party by targeting its leaders. The group entered Yemen with twelve soldiers, three Americans, who received $25,000 a month for the mission, while the rest were soldiers from France and received $10,000 a month, with additional bonuses for "successful kills."

95.    Article 1 of the International Convention against the Recruitment, Use, Financing and Training of Mercenaries, and Article 47 of Additional Protocol I to the Geneva Conventions (1977) apply to these people. Both articles describe the mercenary as a person who is recruited to fight in an armed conflict, such as Yemen's current conflict, and is not a member of the armed forces of either party to the conflict.

96.    They further state that mercenaries are "motivated to take part in the hostilities essentially by the desire for private gain and, in fact, [are] promised… material compensation substantially in excess of that promised or paid to combatants of similar rank and functions in the armed forces of that party."

97.    The UAE's inclusion of these mercenaries into their armed forces by giving them military ranks is a thinly veiled attempt to skirt the definition of the 'mercenary' as set out in the text of the above-mentioned articles.

98.    The United States has a duty to hold accountable those involved in the commission of these crimes, particularly since Article 5 of the UN Mercenary Convention prohibits states from recruiting, using, financing or training mercenaries, and hence states parties to the Convention shall punish those involved in this crime "with the appropriate measures to prevent the recruitment, use, financing or training of mercenaries for that purpose."

99.    The crime of 'extrajudicial killing' of civilians and politicians also applies in this case, constituting a war crime under international humanitarian law.

100.    A SOG representative who works with Golan reported that a uniformed Emirati officer handed them a list of targets, including twenty-three names. Some of them were members of the al- Islah Party. The targets included in the list were clerics, opposition party officials and genuine terrorists.

101.    Likewise, Erik Prince, after selling Blackwater founded RRSC headquartered in the UAE and has, according to the NY Times, said things like the need for RRSC's services was evident because "Muslim soldiers, Mr. Prince warned, could not be counted on to kill fellow Muslims."[37]

102.    According to Article 8 (2c), violence against life and persons, including murder, and execution without prior judgment by a competent court, constitute war crimes.

103.    Article 4 (2) of Additional Protocol II to the Geneva Conventions prohibits "violence to the life, health and physical or mental well-being of persons, in particular murder."

104.    The Euro-Mediterranean Human Rights Monitor and SAM for Rights and Liberties has called on the United States to take action against those found guilty of the said crimes and noted that U.S. law criminalizes "conspiracy to kill, kidnap and mutilate" persons in another country,

---

[37] Ibid

and states that military services provided to foreign states shall be regulated by the U.S. Department of State.

105.    The Euro-Med Monitor and SAM have also called on the UN Commission of Experts to investigate the war crimes in Yemen and to hold folks like the Defendants herein and the UAE's responsibility for such disgraceful crimes.

## WIDELY REPORTED ATRIOICITIES MAKES CONDUITS CULPABLE FOR PROVIDING ACCESS TO THE U.S. FINANCIAL SYSTEM

106.    In furtherance of the conspiracy to provide the dollars and euros needed by UAE and SOG to conduct its anti-terrorist terror operations, the banks noted above would have and could have and should have known that funds transmitted or wired to SOG or RRSC or to ABC Corp 1-100 and/or John Doe 1-100 were being used for illegal purposes, including extrajudicial killings.

107.    A correspondent bank is a financial institution that creates and maintains an account for another financial institution to receive deposits from, or to make payments on behalf of, that other financial institution or to engage in other financial transactions related to that other financial institution.

108.    Correspondent banks can act as intermediaries between banks in different countries or as agents processing local transactions for clients when they are traveling abroad. At the local level, correspondent banks can accept deposits, process documentation, and serve as transfer agents for funds. The capability to execute these services relieves domestic banks of the need to establish a physical presence in foreign countries. Foreign banks often use correspondent banks in the United States to access the U.S. financial system and to conduct U.S. dollar transactions.

109.    At all times relevant to Plaintiffs' claims Defendants' bank maintained a direct or indirect correspondent banking relationship with at least one New York bank which cleared U.S. dollar

transactions for Defendants.

110.    Defendant's correspondent accounts in New York allowed it access to the U.S. financial system to complete transactions in U.S. dollars and benefit from the stability and reliability of New York's banking laws.

111.    Defendant used its correspondent banking relationships in New York to process U.S. dollar transactions for UAE Charity which allowed UAE entities and SOG and/or other Defendants to obtain large volumes of U.S. dollars for distribution for so-called anti-terrorist activities which included extra judicial killings of innocent civilians and opposition politicians besides terrorists and transfer of funds and weapons to actual other terrorist factions.  UAE and SOG could not have obtained those U.S. dollars without these banks' participation in this terrorist funding scheme.

112.    At the time both UAE and the noted banks participated in this conspiracy, they knew or should have known that UAE and SOG or RRSC regularly targeted innocent civilians for assassinations and other forms of indiscriminate attacks that caused the deaths or injuries of unrelated innocent civilians as collateral damage.

113.    At all times relevant to this complaint, the UAE and banks noted above were directed, owned, or controlled by the UAE.

114.    Without the support provided through this conspiracy, the UAE and SOG or RRSC and all Defendants would have been unable to carry out the attacks that killed or injured Plaintiffs.

## CLAIMS FOR RELIEF
## <u>FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS</u>

### AIDING AND ABETTING FOREIGN TERRORIST
### ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)

115.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

116.    Plaintiffs assert this cause of action under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

117.    Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals.

118.    UAE's recruits including SOG, RRSC, ABC Corp 1-100 and John Doe 1-100 and all should be deemed foreign terrorist organizations ("FTOs") at the time they committed, planned, and authorized the so-called anti- terrorist attacks that killed and injured Plaintiffs.

119.    Those terrorist attacks were acts of international terrorism, as defined by 18 U.S.C. § 2331. The attacks: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Yemen and the United States, to influence the policies of the Yemeni and American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that UAE and SOG and/or RRSC and Defendants Golan , ABC Corp 1-100 and John Doe 1-100 raised money internationally, intended to impact the citizens and governments of Yemen and the United States, operated internationally and sought asylum in multiple countries in the Middle East.

120. Defendants as well as the unindicted co-conspirator banks knowingly provided substantial assistance to those acts of international terrorism.

121. As Plaintiffs allege in detail above, Defendants provided substantial assistance to UAE and SOG or RRSC and Defendants Golan and Prince, ABC Corp 1-100, and John Doe 1-100, among other conduct: (a) transferring significant sums of money to the FTOs, their operatives and their front organizations; (b) maintaining bank accounts for the benefit of those organizations, their front organizations, and their senior operatives; (c) providing UAE and SOG or RRSC and Defendants Golan or Prince, ABC Corp 1-100 and John Doe 1-100 with access to U.S. dollars and the U.S. banking system; (d) providing seeming legitimacy to the FTOs' efforts to raise funds to finance their operations and to compensate terrorists and their family members following terrorist attacks; and (e) enabling the FTOs to convert funds nominally intended to support training causes into the resources necessary to commit terrorist attacks.

122. Defendants' services and support provided encouragement to would-be terrorists and incentivized their future attacks and caused the maiming and deaths of innumerable innocent civilians.

123. At the time Defendants provided that substantial assistance to UAE and SOG and Defendants Golan and/or Prince , ABC Corp 1-100 and John Doe 1-100, Defendants knew that: (a) the two FTOs were being accused by international human rights groups of war crimes; (b) the two FTOs and their operatives engaged in terrorism under guise of anti-terrorist security operations, including the attacks alleged herein; and (c) the financial assistance that Defendants were providing to those FTOs was essential to their ability to carry out terrorist attacks, including the attacks that injured Plaintiffs.

124.    Defendants also intended that their substantial assistance would facilitate the ability of UAE and SOG and RRSC and Defendants Golan and/or Prince, ABC Corp 1-100, and John Doe 1-100, to carry out their terrorist attacks against Plaintiffs and other civilians.  As a result, Defendants recognized that they played an integral role in the FTOs' terrorist activities.

125.    The substantial assistance that the Defendants provided to UAE and SOG and RRSC Defendants Golan and/or Prince, ABC Corp 1-100 and John Doe 1-100 was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.

126.    As a direct and proximate result of the substantial, knowing assistance that Defendants provided to UAE and SOG and RRSC and Defendants Golan and/or Prince, ABC Corp 1- 100 and John Doe 1-100, Plaintiffs have suffered significant physical, psychological, and emotional injuries. Defendants knowingly aided and abetted UAE and SOGand RRSC  within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of Halberstam v. Welch, 705 F.2d 472 (D.C. Cir.1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." See Justice Against Sponsors of Terrorism Act ("JASTA"), § 2b.

127.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
#### (Conspiracy Liability)

128.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

129.    Plaintiffs assert this cause of action under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

130.    Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals.

131.    Defendants conspired with each other, the UAE and SOG and RRSC, the government of UAE and others to bring about acts of international terrorism (under the guise of stamping out terror) against Americans in Yemen. Defendants joined the conspiracy by agreeing, among other things, expressly or tacitly to raise or provide funds for SOG or RRSC and Defendants Golan and/or Prince, ABC Corp 1-100 and John Doe 1-100, both organizations designated as foreign terrorist organizations by the United States, Yemen and other nations, and to distribute those funds on UAE and SOG and RRSC and Defendants Golan, Prince ABC Corp 1-100 and John Doe 1-100's behalf. By engaging in that conduct, UAE and the Defendants furthered the goals of the conspiracy.

132.    Defendants and the UAE and unindicted banks joined the conspiracy by agreeing, among other things, expressly or tacitly to: (a) allow UAE entities to use accounts at Defendant bank to funnel money to and fund UAE and SOG and RRSC, (b) allow other groups linked to the UAE or SOG, to maintain accounts at the bank used to funnel money to UAE and SOG, and (c) give the UAE and SOG and RRSC, and Defendants Golan, Prince ABC Corp 1-100 and John Doe 1-100, access to U.S. dollars through the U.S. financial system through Defendant's correspondent

banking relationships in the U.S. By engaging in that conduct, the Defendant bank furthered the goals of the conspiracy.

133.    Defendant UAE National Bank joined the conspiracy by agreeing, among other things, expressly or tacitly to:  (a) to provide banking services to UAE and SOG or RRSC leadership headquartered in Doha, (b) to provide banking services to its co-conspirator UAE Charity, and (c) by employing and providing banking services to the chair of the U.S.-designation SDGT Union of Good, a fundraising front for UAE and SOG.

134.    Defendants and the unindicted Banks, in association with the UAE government, connected the two banks to the conspiracy.

135.    These banks knew that by allowing a notorious figure like Defendant Golan and/or Prince to maintain accounts at the bank and to disregard suspicious transactions involving those accounts it was joining the conspiracy.

136.    Defendants and the unindicted Banks knew that by providing services to notorious figures like Defendant Golan and Prince and SOG and RRSC as well as the other Defendants, they were joining the conspiracy. Defendants knew that the government of the UAE and the UAE's leadership openly supported the UAE and SOG both by financing its operations and providing a safe haven to the UAE and SOG's leadership.

137.    Defendants and the unindicted co-conspirators herein knew that by permitting use of accounts at the banks to funnel money to SOG or RRSC and Defendants Golan and Prince, ABC Corp 1-100 and John Doe 1-100, were joining a conspiracy that had as an essential goal the commission of acts of international terrorism, including the kidnapping and murder of Americans in Yemen.

138.    As a direct and proximate result of the Defendants' conspiracy and the steps they knowingly took in furtherance thereof, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

139.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### PROVIDING MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)

140.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

141.    Plaintiffs assert this claim for Defendants' violations of 18 U.S.C. §§ 2333(a) and 2339A.

142.    Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals or legal residents thereof.

143.    As Plaintiffs allege in detail above, the financial assistance that Defendants provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 played an integral role in the ability of those FTOs to carry out terrorist attacks, including the attacks that killed and injured Plaintiffs.

144.    That financial assistance provided material support to the efforts of UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100, and John Doe 1-100 to engage in acts of international terrorism, including the attacks that killed and injured Plaintiffs.

145.    As a result, Defendants committed acts of international terrorism, as defined by 18 U.S.C.§ 2331.

146.    Specifically, the substantial financial assistance that Defendants provided to SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 John Doe 1-100 constituted acts of international terrorism because that financial assistance: (a) directly endangered human life; (b) violated federal and state laws regarding, among other crimes, money laundering and terror financing; (c) appeared to be intended to intimidate or coerce the civilian populations of Yemen and the United States, to influence the policies of the Yemeni and American governments, and to affect the policies of those governments; and (d) occurred primarily outside the United States and transcended national boundaries in that Defendants operated internationally in providing financial assistance to SOG and Defendants Golan , ABC Corp 1-100 and John Doe 1-100.

147.    Defendants and unindicted co-conspirators provided their material support to UAE AND SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 knowing or intending that the FTOs would utilize the financial assistance that Defendants provided in furtherance of their terrorist activities, including the attacks that killed and injured Plaintiffs.

148.    UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 John Doe 1-100 did rely upon the financial assistance and material support provided by Defendants in carrying out the FTOs' terrorist activities.

149.    UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 engaged in acts of physical violence outside of the United States with the intent to kill or to cause serious bodily injuries to Plaintiffs, nationals of the United States. The FTOs engaged in that illicit conduct pursuant to a joint plan and conspiracy with Defendants and others.

150.    The FTO's acts of physical violence did cause Plaintiff's death and serious bodily injuries.

151.    The material support and substantial assistance that Arab Bank provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 was a substantial

factor in causing Plaintiffs' injuries. Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100, and John Doe 1-100.

152.    As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to UAE and SOG or RRSC or Prince, and Defendants Golan, ABC Corp 1-100 and John Doe 1-100, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

153.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

## PROVIDING MATERIAL SUPPORT TO FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

154.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein. Plaintiffs assert this claim for Defendant's violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1).

155.    Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals.

156.    At the time of the attacks that injured Plaintiffs, UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 were FTOs.

157.    At that time, Defendants knew that UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 were FTOs, that those organizations engaged in terrorist activity, and that they engaged in terrorism.

158.    As Plaintiffs allege in detail above, Defendants provided material support to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100, and John Doe 1-100.

159.    That material support was integral to the ability of UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100, and John Doe 1-100 to carry out their terrorist attacks, including the attacks that injured Plaintiffs.

160.    As Plaintiffs allege in detail above, the material support that Defendants provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 constituted acts of international terrorism, as defined in 28 U.S.C. § 2331(1).

161.    The material support that Defendants provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 was a substantial and foreseeable factor in causing Plaintiffs' injuries.

162.    Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100, and John Doe 1-100.

163.    As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

164.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

## FOR TORTURE AND/OR EXTRAJUDICIAL KILLING OF THE PLAINTIFF

## IN VIOLATION OF 18 U.S.C. § 2340 (a)(1) AND the TORTURE VICTIM PROTECTION ACT of 1991 (18 U.S.C. §§ 1350)

165.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein. Plaintiffs assert this claim for Defendant's violation of 18 U.S.C. §§ 2340(a) and the Torture Victim Protection Act of 1991 (18 U.S.C. §§ 1350)

166.    Plaintiffs are nationals of the United States or the estates, survivors, or heirs of U.S. nationals or of a foreign national that has exhausted all local remedies with no other means of securing justice.

167.    At the time of the actions that injured Plaintiffs, UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 were FTOs.

168.    At that time, Defendants knew that UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 were FTOs, that those organizations engaged in acting in an official capacity for a foreign nation, committing torture and/or extrajudicial killing.

169.    At the time, Defendants in their capacity as public officials caused or committed under color of law torture of the Plaintiff while Plaintiff was within their custody or control including acts specifically intended to inflict severe physical or mental pain or suffering and/or extrajudicial killing.

170.    As Plaintiffs allege in detail above, Defendants provided material support to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100, and John Doe 1-100.

171.    That material support was integral to the ability of UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100, and John Doe 1-100 to carry out their terrorist attacks, including the attacks that injured Plaintiffs.

172.    As Plaintiffs allege in detail above, the material support that Defendants provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 constituted acts of torture or extrajudicial killing, as defined in 28 U.S.C. § 2340(A).

173.    The material support that Defendants provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100 was a substantial and foreseeable factor in causing Plaintiffs' injuries.

174.    Moreover, Plaintiffs' torture or extrajudicial killing were a foreseeable result of the material support and substantial assistance that Defendants provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100, and John Doe 1-100.

175.    As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to UAE and SOG and Defendants Golan, or RRSC or Prince, ABC Corp 1-100 and John Doe 1-100, Plaintiffs have suffered significant physical, psychological, and emotional injuries including torture or death.

176.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court:

(a)    Accepts jurisdiction over this action;

(b)    Enter judgment against Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial, and pre-judgment interest thereon;

(c)    Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant

to 18 U.S.C. § 2333(a), and pre-judgment interest thereon;

(d)    Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18U.S.C. § 2333(a), and pre-judgment interest thereon; and

(e)    Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2340 (a) 1 or § 2350 or the ASTVA, and pre-judgment interest thereon; and

(f)    Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated May 28, 2025
        New York, New York

Respectfully Submitted,

/s/ David M. Schwartz, Esq._____
David M. Schwartz, Esq.
AIDALA, BERTUNA & KAMINS, P.C.
546 Fifth Avenue, 6th FL.
New York, NY 10036
Tel: (212) 641-0499
dschwartz@aidalalaw.com

Attorneys for Plaintiff ZENA ALSANABANI
in her individual capacity and/or Executor of
The Estate of Abdulmalek Anwar Alsanabani

34