**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**ZENA ALSANABANI in her individual capacity and/or Executor of The Estate of Abdulmalek Anwar Alsanabani,**

    Plaintiff,

       **v.**

**SPEAR OPERATIONS GROUP**, *et al.*,

    Defendants.

</td><td>

Civ. Action No.  25-1684 (JDB)

</td></tr>
</table>

<u>**MEMORANDUM OPINION AND ORDER**</u>

Zena Alsanabani sues several private military contractors, banks, and associated individuals for the death of her brother in connection with the United Arab Emirates' military campaign in Yemen.  Before the Court is First Abu Dhabi Bank's motion to dismiss.  For the reasons explained below, the motion is granted.

<u>**FACTUAL BACKGROUND**</u>

The following facts are taken from Alsanabani's Complaint.  They are assumed to be true at this stage.

The Yemeni Civil War has raged since 2014.  <u>See</u> 2d Am. Compl. ("Compl.") [ECF No. 28] ¶ 43.  This conflict has fractured the country, leaving territory governed by various political entities and militias.  Many external powers have intervened, including the United Arab Emirates (UAE).  <u>Id.</u> ¶ 44.  The UAE supports the Southern Transitional Council, a faction that controls substantial territory in the South of Yemen.  <u>Id.</u> ¶¶ 20, 68.  The Council maintains control over territory with the assistance of local groups and UAE-funded mercenaries.  Opp'n to Mot. to

Dismiss ("Opp'n") [ECF No. 31] at 4.  It has been accused of human rights abuses by media outlets and NGOs.  See Compl. ¶¶ 21, 26.

The UAE relies on two private military contractors, Spear Operations Group and Reflex Response Security Consultants, to carry out missions in Yemen.  Id. ¶¶ 4, 19.  These missions include combat operations, as well as training and coordination for local UAE-supported Yemeni groups, including the Southern Transitional Council.[1]  Id. ¶¶ 18-22.  Spear Operations Group and Reflex Response Security Consultants have also been accused of human rights abuses by media outlets.  See id. ¶ 89.  These organizations are not designated as Foreign Terrorist Organizations, but Alsanabani claims they "should be."  Id. at 19.

The UAE pays Spear Operations Group and Reflex Response Security Consultants through dollar-denominated electronic transfers.  See id. ¶¶ 25, 83, 128.  First Abu Dhabi Bank is one financial institution that processes these transfers.  Id. ¶¶ 66, 83, 128.  The UAE "nominally" allocates the money it pays these firms for "security and training purposes," but the contractors repurpose those funds for various "operational uses" including the aforementioned training and support for the Southern Transitional Council, as well as other unspecified activities that Alsanabani alleges are "terroristic."  Id. ¶¶ 82-83.

In 2021, Abdulmalek Anwar Alsanabani, a resident of Fresno, California, traveled to Yemen to visit family.  Id. ¶ 67.  He was stopped at a checkpoint by the Security Belt Forces, a militia that is "loyal to the Southern Transitional Council and the UAE government."  Id. ¶ 69.  The soldiers were suspicious of Alsanabani because he was carrying U.S. dollars and traveling from the United States.  Id. ¶¶ 70-71.  They took him into custody, and he was found dead in a

---

[1] The complaint does not specify the nature of these training and coordination functions.

hospital several days later.  Id. ¶¶ 71-72.  A local news outlet reported that he was killed by "soldiers loyal to the" Southern Transitional Council.  Id. ¶ 74.

Zena Alsanabani is Abdulmalek Anwar Alsanabani's sister.  Id. ¶ 28.  She sues the defendants for their alleged roles in the murder of her brother on behalf of her brother's estate.  Id..  She also brings claims in her individual capacity for emotional distress stemming from her brother's killing.  Id. ¶¶ 75-81.  First Abu Dhabi Bank has moved to dismiss the claims against it.  Mem. in Support of Mot. to Dismiss (Mot.) [ECF No. 30-1] at 1.  That motion is now ripe.

## LEGAL BACKGROUND

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not contain sufficient factual matter, accepted as true, to state a plausible claim to relief.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  When assessing a motion to dismiss, a court must "assume [the] veracity" of all "well-pleaded factual allegations," id. at 679, "construe the complaint in favor of the plaintiff," and give the plaintiff "the benefit of all inferences that can be derived from the facts alleged," Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (quotation omitted).  However, a court need not credit "threadbare recitals of the elements of a cause of action," "conclusory statements," Iqbal, 556 U.S. at 678 (citation modified), or "legal conclusions cast as factual allegations," Hettinga, 677 F.3d at 476.

## ANALYSIS

Alsanabani brings four claims under the Anti Terrorism Act and one claim under the Torture Victim Protection Act.  Her theory is that First Abu Dhabi Bank provided financial assistance, through a chain of intermediaries, to the group that tortured and murdered her brother.

But the allegations in her complaint are thin and, even taken as true, fail to plead essential elements of each charged offense.[2]  Accordingly, her claims must be dismissed.

**I.      Alsanabani fails to plausibly allege that First Abu Dhabi Bank proximately caused the death of her brother.**

The Anti Terrorism Act provides a cause of action for American nationals injured by international terrorism.  18 U.S.C. § 2333; Atchley v. AstraZeneca UK Ltd., 165 F.4th 592, 600 (D.C. Cir. 2026).  The Act allows plaintiffs to sue those who directly support terrorists, as well as those who are secondarily liable.  Atchley, 165 F.4th at 600.  Alsanabani alleges both—she claims that First Abu Dhabi Bank materially supported the groups who killed her brother, and that it aided-and-abetted and conspired with others to do the same.  To state any of those claims, however, she must plausibly allege that the Bank's actions proximately caused the terrorist attack at issue.  Ofisi v. BNP Paribas, S.A., 77 F.4th 667, 677 (D.C. Cir. 2023).

An injury can have many causes, but only proximate ones give rise to legal liability.  See CSX Transp., Inc. v. McBride, 564 U.S. 685, 692 (2011).  To show proximate cause, plaintiffs must demonstrate (1) that the defendant's behavior was a "substantial factor in the sequence of events that led to the plaintiffs' injuries" and (2) that those injuries were reasonably foreseeable from the defendant's conduct.  Owens v. Republic of Sudan, 864 F.3d 751, 794 (D.C. Cir. 2017), vacated and remanded on other ground sub nom. Opati v. Republic of Sudan, 590 U.S. 418 (2020) (citation modified).  Additionally, when the alleged causal chain runs through payments to a

---

[2]  First Abu Dhabi Bank also argues that Alsanabani's claims should be dismissed for other reasons.  It contends Alsanabani's claims brought on behalf of her brother's estate should be dismissed because he is not an American citizen, as required to state a claim under the Anti Terrorism Act.  Mot. at 19.  It also contends that some of Alsanabani's secondary liability claims should be dismissed because Alsanabani has not shown that groups that received funding were designated terrorist organizations, as required under the Act.  Mot. at 22.  And it believes that Alsanabani's direct liability claims should be dismissed because the attack against her brother does not qualify as an act of international terrorism.  Mot. at 20.  Alsanabani responds to each point; for example, she argues that an Al Qaeda affiliate was involved in the conspiracy to murder her brother, Opp'n at 29-30, but the Bank's contentions may have merit.  Resolving those arguments is not necessary for the disposition of Alsanabani's claims at this juncture but will likely be considered should Alsanabani file an amended complaint.

4

sovereign state intermediary "with 'many legitimate agencies, operations, and programs to fund,' the need for additional allegations supporting substantiality is all the more acute." Ofisi, 77 F.4th at 678. To satisfy proximate causation in such a case, plaintiffs must plead facts alleging that the payments were necessary for the intermediary state to fund the terrorist group, id. (citing Owens v. BNP Paribas, S.A., 897 F.3d 266, 276 (D.C. Cir. 2018)), or that the funds were transferred to the terrorist group and facilitated the "capabilities" the group used to carry out the attack, Owens, 864 F.3d at 797.

Alsanabani alleges a long string of events that tie First Abu Dhabi Bank to the death of her brother. She first contends that First Abu Dhabi Bank processes dollar-denominated transactions for the United Arab Emirates. The UAE allegedly uses the bank to send money to two private military contractors, Spear Operations Group and Reflex Rapid Security Consultants. That money, nominally earmarked for "security purposes," allegedly funds a wide range of the contractors' activities, including procuring weapons, transportation, paying salaries, and marketing. Compl. ¶ 82, 87. The contractors engage in attacks in Yemen on behalf of the UAE, but also provide "a command structure and training" for the Southern Transitional Council, the local faction supported by the UAE. Id. ¶¶ 18-22. The Southern Transitional Council, in turn, works with various local militias that are loyal to it, although the precise nature of those relationships is unexplained. Ultimately, one of those militias, known as the Security Belt Forces, allegedly detained and murdered Alsanabani's brother. See Opp'n at 10 ("[First Abu Dhabi Bank's] funds were channeled to Spear, Reflex, and others to provide a command structure and training for the Southern Transitional Council's armed groups, including the Security Belt Forces whose soldiers tortured and murdered Mr. Alsanabani.").

These allegations are insufficient to support the inference that the financial transfers facilitated by First Abu Dhabi Bank were a substantial factor in the death of Alsanabani's brother. As an initial matter, the UAE is a sovereign state with legitimate interests, so Alsanabani faces the associated heightened obligation to show substantiality. See Ofisi, 77 F.4th at 678.

The complaint fails to allege that the bank's money was used by the Security Belt Forces in the commission of the attack in this case. See id. (finding allegations that defendants transferred money to terrorists insufficient where plaintiffs failed to plead facts suggesting the money contributed to the attack in question). That is important because the D.C. Circuit suggests that the relevant level of analysis for determining proximate cause is whether the defendant's money aided in the specific terrorist attack at issue. Owens, 897 F.3d at 276. But other than conclusory assertions that the attack would not have been carried out without the funds provided by First Abu Dhabi Bank, Alsanabani alleges no specific facts to support such an inference. To the contrary, Alsanabani suggests that UAE money was not directly connected to any particular attack, but was allocated generally "to, among other things, provide weapons, explosives, transportation services, safehouses, training and salaries" to the UAE's private military contractors. Compl. ¶ 82. These allegations suggest, at most, that the Security Belt Forces were the ultimate recipients of an unspecified amount of general-purpose funds that the UAE's contractors distributed to its proxies. That is not enough to suggest that the First Abu Dhabi Bank's assistance was a substantial factor in the particular attack in question.

Nor does Alsanabani credibly allege that the UAE could not have funded its military campaign in Yemen without the Bank's assistance. In Owens, the D.C. Circuit held that a bank did not proximately cause a terrorist attack because, in part, the plaintiffs failed to plausibly allege that the intermediary country could not have otherwise financed the terrorist entity. See 897 F.3d

6

at 276.  So too here.  The UAE is a wealthy sovereign nation and is presumably capable of routing money to its military contractors using a variety of methods.

Additionally, Alsanabani does not explain the nature of the training or the type of support that the Southern Transitional Council or the Security Belt Forces received from the UAE.  Without more, it is unclear why the UAE's training would make those groups more likely to detain and murder Alsanabani's brother.  She also does not allege specific facts about the relationship between the Southern Transitional Council and the Security Belt Forces, such as whether the Council maintained operational control over the latter group—only that the Security Belt Forces were "loyal to" the Council.  Compl. ¶ 67.  That makes it impossible to tell whether the Council influenced or could have prevented Alsanabani's brother's death.  The vagueness of the facts alleged stymie any attempt to determine the relative weights of the causes behind the death of Alsanabani's brother.  So, even if the Bank's money was a factor in the alleged events, Alsanabani has not shown that it was a substantial one.

Finally, Alsanabani also fails to allege facts that indicate that First Abu Dhabi Bank could have reasonably foreseen that its transactions would be used to finance the killing of her brother.  To start, there are no allegations that the Bank transferred money to the Security Belt Forces, the militia that killed Alsanabani's brother, or even to the Southern Transitional Council.  At most, she alleges that the UAE's mercenaries used the money for training and support of the Southern Transitional Council, who in turn oversaw the Security Belt Forces.  Such a chain of intermediaries makes foreseeing the end-use of the Bank's money difficult, especially because Alsanabani concedes that the funds were nominally allocated by the UAE for legitimate "security and training purposes."  Compl. ¶ 82.  And, as discussed below, Alsanabani does not plead sufficient facts that

suggest that the Bank had constructive notice that their money would be used for civilian killings. See infra Part.II.

In sum, Alsanabani does not allege facts that suggest the transactions processed by First Abu Dhabi Bank were a substantial factor in the death of her brother, or that the Bank could have reasonably foreseen her brother's death from its activities. Accordingly, she has not established proximate cause and her Anti Terrorism Act claims must be dismissed.

## II.    Alsanabani fails to plausibly allege secondary liability

Alsanabani's secondary liability claims—aiding and abetting and conspiracy—also fail because the complaint does not allege facts that suggest First Abu Dhabi Bank wanted acts of terrorism to take place.

### A. Aiding and Abetting

The Anti Terrorism Act establishes aiding-and-abetting liability for anyone who "knowingly provid[es] substantial assistance" to acts of international terrorism. 18 U.S.C. § 2333(d); see also Atchley, 165 F.4th at 601. To aid and abet a crime, a defendant must "take an affirmative act in furtherance of that offense" and "intend to facilitate the offense's commission." Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos, 605 U.S. 280, 291 (2025). The defendant's participation must be "culpable," supporting an inference that the defendant wanted the crime to succeed. Twitter, Inc. v. Taamneh, 598 U.S. 471, 489-90 (2023). Thus, absent an "independent duty to act," a person's "failures," "omissions," or "inactions" will "rarely support aiding-and-abetting liability." Smith & Wesson, 605 U.S. at 292. And, for the same reason, ordinary course business activities that incidentally assist in a crime typically do not constitute aiding-and-abetting. Id.

Two recent cases help illustrate the bounds of aiding-and-abetting liability. In Atchley, the D.C. Circuit held that the defendant could be liable for aiding and abetting for directly paying a

terrorist organization bribes to secure lucrative government contracts from the terrorist-controlled health ministry. 165 F.4th at 596-97.   In that case, the plaintiffs plausibly alleged that the defendants had actual knowledge that the terrorist organization controlled the health ministry based on the defendants' own observed local interactions.  Id.  By contrast, in Smith & Wesson, the Supreme Court held that gun manufacturers were not liable for aiding and abetting criminal violence by selling firearms through a chain of intermediaries to cartels.  605 U.S. at 298.  Selling firearms is not culpable behavior, even knowing some of them might be diverted to criminal use, because there was no reason to believe that gun manufacturers "attend to the conduct" of parties "two levels down" the supply chain.  Id. at 295.  Without facts that "provide grounds for thinking that anyone up the supply chain . . . often acquires that information," any allegations that Smith & Wesson intended to support downstream criminality were "all speculation."  Id. at 296.

Alsanabani does not allege facts that, taken as true, establish the intent to aid and abet terrorism.  For starters, unlike in Atchley, there is no allegation that First Abu Dhabi Bank directly sent money to the Security Belt Forces, knew that their money would ultimately flow to the Security Belt Forces, or had actual knowledge that the Security Belt Forces engaged in human rights violations.  At most, Alsanabani makes the conclusory assertion that the Bank "knew or had reason to know" that money sent to Spear Operations Group and Reflex Rapid Security Consultants was being used for unspecified "abuses" based on news coverage of those organizations.  Compl. ¶ 89.  But that is a far cry from the specific allegations in Atchley that AstraZeneca had actual knowledge that their money was being diverted to terrorists because their agents witnessed evidence of terrorist control over the health ministry first-hand.  165 F.3d at 609. And Alsanabani has not identified any cases where the level of constructive knowledge she alleges has been enough to render a financial institution culpable for the end-use of its transactions.

The allegations in this case are more like the non-culpable conduct in Smith & Wesson. As in that case, First Abu Dhabi Bank is only alleged to have engaged in ordinary-course business—processing dollar-denominated transactions for a foreign sovereign. Those routine activities contrast with the abnormal, culpable conduct of bribery at issue in Atchley. Also, like in Smith & Wesson, the Bank is at least two layers removed from the organization that carried out the alleged criminality. And Alsanabani does not allege that banks generally attend to the conduct of parties two levels down from transactions that they process.

At bottom, Alsanabani alleges that First Abu Dhabi Bank engaged in standard banking transactions for the UAE, and that some of that money, through a string of intermediaries, eventually reached the organization that killed her brother. It "is far from clear that such behavior, without more, could ever count as aiding and abetting." Smith & Wesson, 605 U.S. at 294. The Bank did not engage in abnormal behavior to privilege criminality, was not directly involved with the organization that committed the alleged crime at issue and was not faced with clear evidence that the money was being diverted for illicit purposes. Accordingly, the Complaint does not describe the type of culpable behavior necessary to suggest that First Abu Dhabi Bank wanted the alleged criminal activity to succeed. Alsanabani's aiding-and-abetting claim thus fails.

### A. Conspiracy

The Anti Terrorism Act provides for liability for those who conspired with the "person who committed" the "act of international terrorism" that gave rise to the plaintiff's injuries. 18 U.S.C. § 2333(d)(2). The 2016 amendment to the Act names our Circuit's decision in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), as providing the "proper legal framework for how such liability should function." Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, § 2(a)(5), 130 Stat. 852 (2016). Atchley, 165 F.4th at 601. To plead civil conspiracy under Halberstam, the plaintiff must allege "(1) an agreement between two or more persons; (2) to participate in an

10

unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." Halberstam, 705 F.2d at 477.

A conspirator must enter "an agreement with the specific intent that" the conspiratorial goal be completed. !Ocasio v. United States, 578 U.S. 282, 288 (2016) (citation modified). While courts may "infer an agreement from indirect evidence in most civil conspiracy cases, a complaint must nonetheless allege that the coconspirators were pursuing the same object." Freeman v. HSBC Holdings PLC, 57 F.4th 66, 79 (2d Cir. 2023) (citation modified). And a "person who is indifferent to the goals of an ongoing conspiracy does not become a party to th[at] conspiracy merely because that person knows that his or her actions might somehow be furthering that conspiracy." United States v. Collins, 966 F.2d 1214, 1219-20 (7th Cir. 1992).

Alsanabani alleges that First Abu Dhabi Bank entered into an agreement with the named defendants "and others" to "bring about acts of international terrorism" against "Americans in Yemen." Compl. ¶¶ 135-46. Thus, Alsanabani must plausibly allege that the Bank had the specific intent to facilitate the terroristic killings of American citizens.

She has not done so. The Bank processed dollar denominated transactions for the UAE. As discussed above, that is insufficient to suggest that the Bank intended to support the goals of its client, let alone international terrorism. The provision of ordinary-course banking services does not imply that the Bank pursues the same object as its customers. See Freeman, 57 F.4th at 79-80 (finding no conspiracy to support terrorism between a bank and terrorist groups). "None of the allegations suggest that [the] Bank cared how [the UAE] spent the funds that it processed for them," much less downstream beneficiaries. Kemper v. Deutsche Bank AG, 911 F.3d 383, 395 (7th Cir. 2018). And nothing else in the complaint suggests that the Bank wanted acts of

11

international terrorism to succeed.  Accordingly, Alsanabani's allegation that First Abu Dhabi Bank entered into a conspiracy to commit terrorism against Americans in Yemen fails.

### III.    Alsanabani's TVPA claim fails because First Abu Dhabi Bank is not a natural person

The Torture Victim Protection Act creates a cause of action against "individual[s]" who torture or kill others under the authority or color of law of any foreign nation.  Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat 73 (1991); Mohamad v. Palestinian Auth., 566 U.S. 449, 451 (2012).  The Supreme Cout has interpreted the "term 'individual' as used in the Act" to include "only natural persons."  Id. (barring application of TVPA to the Palestinian Authority and Palestinian Liberation Organization).  First Abu Dhabi Bank is a corporation, not a natural person.  Accordingly, Alsanabani's claim cannot succeed.

Alsanabani's only response to this glaring deficiency is that the Supreme Court has recently granted certiorari in another Torture Victim Protection Act case, Cisco Sys. v. Doe I, to be decided during the 2026-27 term.  No. 24-856 (U.S. Jan. 9, 2026).  Thus, she argues, this Court should delay resolution of the issue until the Supreme Court decides that case.  But that case is about whether the TVPA "allows a judicially-implied private right of action for aiding and abetting." Petition for Certiorari at 2, Cisco Sys. v. Doe I, No. 24-856 (U.S. Jan. 31, 2025).  It has nothing to do with whether the TVPA allows for suits against non-natural persons, and neither party has asked the Supreme Court to revisit that question.  Accordingly, there is no reason that this Court should wait for the resolution of that case.

Because the TVPA does not provide a cause of action against corporate defendants like First Abu Dhabi Bank, this claim must be dismissed.

**IV.    Dismissal with prejudice is unwarranted for Alsanabani's ATA claims, but warranted for her TVPA claim**

Dismissal with prejudice is proper when "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficienc[ies of the initial complaint]." Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996).  Typically, this occurs when the complaint contains a legal infirmity that renders relief under the plaintiff's theory impossible or otherwise makes amendment futile.  Id.

Here, Alsanabani's Anti Terrorism Act claims fail because she has not pled sufficient facts to satisfy intent and causation.  Those are factual deficiencies that theoretically could be addressed through amendment.  To be sure, Alsanabani cannot escape dismissal by amending her complaint with conclusory assertions, speculation, or threadbare recitals of proximate cause or mens rea.  And the complaint, as written, may well be infirm for additional reasons, some of which First Abu Dhabi Bank raised in its motion but which the Court did not need to address to dispose of the case.  However, at this stage, dismissal with prejudice is premature.

By contrast, Alsanabani's TVPA claim fails for an incurable legal deficiency.  The statute only provides a cause of action against natural persons.  First Abu Dhabi Bank is a corporation, and no amount of amendment can alter that.  Accordingly, that claim is dismissed with prejudice.

**CONCLUSION**

Alsanabani fails to plead claims upon which relief may be granted.  Her Anti Terrorism Act claims fail because she does not plead facts that allege First Abu Dhabi Bank proximately caused the death of her brother.  She also does not allege that the Bank engaged in culpable behavior, necessary for aiding-and-abetting liability, or entered into an agreement to promote terrorism, necessary for conspiracy.  Lastly, her TVPA claim fails because First Abu Dhabi Bank is not a natural person, as required by statute.

13

* * *

Upon consideration of [30] First Abu Dhabi Bank's motion to dismiss and the entire record herein, it is hereby ORDERED that the motion is granted; it is further ORDERED that the Anti Terrorism Act claims against it are DISMISSED WITHOUT PREJUDICE; it is further ORDERED that the Torture Victim Protection Act claim against it is DISMISSED WITH PREJUDICE; and it is further ORDERED that [17] First Abu Dhabi Bank's prior motion to dismiss, filed before plaintiff amended her complaint, is DENIED AS MOOT.

SO ORDERED.

/s/
JOHN D. BATES
United States District Judge

Dated: April 13, 2026